UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA GRIMES,

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

Case No. 2:20-cv-12066
District Judge Terrence G. Berg
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I.  Introduction

This is a social security case.  Plaintiff Melissa Grimes (Grimes) brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits (DIB) under the Social Security Act (the Act).  Both parties have filed summary judgment motions (ECF Nos. 14, 17), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ) conclusion that Grimes is not disabled under

1

the Act.  Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 17) be GRANTED, Grimes' Motion for Summary Judgment (ECF No. 14) be DENIED, and the ALJ's decision be AFFIRMED.

## II.   Background

### A.   Procedural History

Grimes was 34 years old at the time of her alleged onset date of July 31, 2015.  (ECF No. 10-3, PageID.102).  She previously worked as a lab assistant/phlebotomist.  (ECF No. 10-6, PageID.303).  Grimes alleged disability due to fibromyalgia, cervical spondylosis, depression, anxiety disorder, alopecia universalis, chronic migraines, gastritis, and irritable bowel syndrome.  (ECF No. 10-3, PageID.103-104).

After Grimes' application was denied at the initial level on November 27, 2017 (*Id*., PageID.113), she timely requested an administrative hearing, which was held on June 11, 2019, before the ALJ.  (ECF No. 10-2, PageID.73-100).  Grimes testified at the hearing, as did a vocational expert (VE).  (*Id*.).

Grimes testified that she lived with her two sons, aged seven and nine, and her sister.  (*Id*., PageID.77-78).  She had a high school education.  (*Id*., PageID.80).  Grimes was able to drive.  (*Id*., PageID.77).  Grimes' sister and mother assisted her with household tasks and caring for the children.  (*Id*., PageID.86-87, 95-96).

In the past, she worked as a phlebotomist.  (*Id*., PageID.81).  The job involved standing, walking, and some light clerical work.  (*Id*.).  Grimes estimated she was on her feet for six hours out of an eight-hour day.  (*Id*., PageID.81-82).  She had to lift up to 15 pounds.  (*Id*., PageID.82).  Grimes stopped working in 2015 "[b]ecause [her] health just got too bad."  (*Id*., PageID.82-83).

Grimes experienced "widespread pain all over."  (*Id*., PageID.83).  She had been "diagnosed with a pretty rare muscle disease," which was "a type of inflammatory myopathy."  (*Id*.).  The pain resulting from this disease was concentrated in her hands.  (*Id*.).  She had difficulty moving her hands.  (*Id*.).  She also experienced neck pain for which she received injections.  (*Id*.).  Grimes took pain medications that made her tired.  (*Id*.).  Additionally, the disease affected her lungs causing shortness of breath.  (*Id*.).  Overall, Grimes had "severe muscle weakness."  (*Id*., PageID.84).

Grimes could no longer lift more than a couple of pounds.  (*Id*.).  She was unable to "do much lifting or reaching or anything because [her] muscles just [were] getting worse."  (*Id*.).  Grimes often had to switch position as sitting or standing for too long caused pain.  (*Id*., PageID.86).  In addition to causing drowsiness, Grimes' medications affected her memory and speech.  (*Id*., PageID.85).  Grimes took two naps each day for approximately two to three hours.  (*Id*.).

3

Grimes also suffered from depression and anxiety.  (*Id.*, PageID.87).  She regularly saw a psychiatrist and therapist.  (*Id.*).  Grimes experienced more bad days than good days.  (*Id.*).  She explained that she felt like she was in a cycle of depression and pain.  (*Id.*).  Grimes took Wellbutrin and Cymbalta to treat her depression and anxiety.  (*Id.*, PageID.92).

Grimes experienced migraines approximately once each week.  (*Id.*, PageID.94).  She took Topamax to prevent migraines and Imitrex to treat them.  (*Id.*).

Grimes was a Jehovah's Witness and attended services twice each week when she felt able to go.  (*Id.*, PageID.89-90).  The services lasted for approximately two hours.  (*Id.*, PageID.89).  If she was unable to attend in person, she called in and listened to the service.  (*Id.*).  Grimes indicated that she usually was only able to attend in person once each week.  (*Id.*, PageID.89-90).

On July 19, 2019, the ALJ issued a written decision finding that Grimes was not disabled.  (*Id.*, PageID.48-62).  On June 5, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (*Id.*, PageID.42-46).  Grimes timely filed for judicial review of the final decision.  (ECF No. 1).

### B.    Medical Evidence

### 1.    Neuro Pain Consultants Records

Grimes routinely treated with a number of providers at Neuro Pain Consultants in Bloomfield Hills including, Marc Wittenberg, M.D., Lisa Morris, N.P, and Marlene Hamama, N.P.

On January 28, 2016, Dr. Wittenberg noted that Grimes complained of multiple pain issues, but that she indicated the worst of the pain was located in her neck.  (ECF No. 10-7, PageID.373-374).  She managed the pain by taking Norco.  (*Id*., PageID.374).  On February 5, 2016, Dr. Wittenberg performed a cervical medial branch bloc of C5-6 and C4-5.  (*Id*., PageID.370).  On February 19, 2016, Dr. Wittenberg performed a cervical medial branch block of C5-6 and C4-5 on the right and left side.  (*Id*., PageID.368).  On February 26, 2016, Morris noted that Grimes reported "excellent pain relief with recent cervical [medial branch nerve blocks]," as well as pain relief from Hydrocodone taken once each night.  (*Id*., PageID.368).

On March 18, 2016, Dr. Wittenberg performed a cervical rhizotomy[1] at C4-C5 and C5-C6 as well as median branches on the right side.  (*Id*., PageID.362).  On

---

[1] "Rhizotomy is a minimally invasive surgical procedure to remove sensation from a painful nerve by killing nerve fibers responsible for sending pain signals to the brain.  The nerve fibers can be destroyed by severing them with a surgical instrument or burning them with a chemical or electrical current.  In most cases, rhizotomy provides immediate pain relief that can last up to several years until the nerve recovers and is able to transmit pain again."
https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/rhizotomy#:~:text=Rhizotomy%20is%20a%20minimally%20invasive,a%20chemical%20or%20electrical%20current (last visited Jan. 28, 2022).

March 24, 2016, Hamama noted that Grimes reported soreness at the site of the rhizotomy. (*Id.*, PageID.358-359). Grimes further reported that Norco provided her "the most adequate pain relief." (*Id.*, PageID.359). On April 21, 2016, Hamama noted that Grimes had a ganglion cyst removed on March 25, 2016, and was soon to begin physical therapy. (*Id.*, PageID.355). Grimes reported that her neck was doing better since taking a Medrol dose pack and Flexeril. (*Id.*). On May 19, 2016, Hamama noted that Grimes had seen a gynecologist regarding her pelvic pain and the gynecologist recommended a partial hysterectomy. (*Id.*, PageID.351). Grimes was still in physical therapy for wrist issues. (*Id.*). Overall, Grimes reported that her neck remained stable and that she only experienced mild pain when doing household tasks like laundry. (*Id.*). On June 16, 2016, Dr. Wittenberg noted that Grimes was stable and "doing well" on her medications. (*Id.*, PageID.347-348). Grimes did not report any new issues with pain. (*Id.*, PageID.348).

On July 12, 2016, Hamama noted that Grimes was scheduled for a hysterectomy the following Monday. (*Id.*, PageID.344). On August 9, 2016, Hamama noted that Grimes had a hysterectomy the previous month and that during the operation kidney stones were discovered and stents placed. (*Id.*, PageID.339). Grimes was prescribed an increased dosage of Norco to manage her postoperative pain, but still reported pain. (*Id.*).

6

On September 9, 2016, Hamama noted that Grimes was having insomnia because of a recent death in the family and that her primary care physician had started her on Trazadone for the short term.  (*Id.*, PageID.335).  She further noted that while Grimes remained stable on pain medication, she had reported increased cervical pain.  (*Id.*).  On September 30, 2016, Dr. Wittenberg performed a cervical rhizotomy at C4-C5 and C5-C6 as well as median branches on the right side.  (*Id.*, PageID.333).

On October 11, 2016, Hamama noted that Grimes had recently been diagnosed with shingles for which Grimes was given medications, including a temporarily increased dosage of Norco.  (*Id.*, PageID.329).  Grimes reported some benefit from the recent right cervical rhizotomy and indicated that she was "stable on Norco for pain relief."  (*Id.*).  She also denied any medication side effects.  (*Id.*).

On November 11, 2016, Marc Wittenberg, M.D. noted that Grimes complained about widespread body pain as well as jaw pain stemming from dental issues.  (*Id.*, PageID.325-326).  On December 9, 2016, Hamama noted that Grimes continued to report neck and midback pain that worsened with activity, but that Grimes was "stable on pain meds."  (*Id.*, PageID.332).  Grimes denied any medication side effects.  (*Id.*).

On January 5, 2017, Hamama noted that Grimes had seen a neurologist for evaluation of headaches and that the neurologist started her on Topamax.  (*Id.*,

7

PageID.318-319).  Grimes reported that she had started physical therapy for thoracic issues and that she "remain[ed] stable on pain meds, [and] denie[d] side effects."  (*Id.*, PageID.319).  On February 2, 2017, Hamama noted that Grimes was attending physical therapy twice each week for cervical/thoracic issues, that Grimes' psychiatrist was weaning her off Klonopin, and that Grimes injured her low back slipping on ice but "remain[ed] stable on Norco for pain relief."  (*Id.*, PageID.314-315).

On March 2, 2017, Hamama noted that Grimes' low back issues stemming from slipping on ice had resolved and that Grimes had discontinued the use of Klonopin, and had good results from physical therapy for cervical spine problems and the use of Norco.  (*Id.*, PageID.311).

On April 24, 2017, Hamama noted that Grimes reported "increased cervical pain with weather changes, more headaches, [but] remain[ed] stable on 4 Norco/day, [and] denie[d] side effects."  (*Id.*, PageID.425-426).

On May 12, 2017, Dr. Wittenberg performed a cervical rhizotomy at C4-C5 and C5-C6 and also median branches on the right side.  (*Id.*, PageID.421-423).  On May 22, 2017, Hamama noted that Grimes' neck was tender and sore, which Grimes attributed to weather changes.  (*Id.*, PageID.416-417).  Grimes reported that the increased Norco dosage was "beneficial for pain relief," and that she was "stretching as tolerated."  (*Id.*, PageID.417).  On June 20, 2017, Hamama noted

that Grimes recently had her dosage Topamax increased because she was still experiencing headaches.  (*Id*., PageID.412).  Grimes also reported 50% relief after her latest rhizotomy and also reported that she was struggling with pain relief despite taking 5 Norco each day.  (*Id*.).  On July 18, 2017, Hamama noted that Grimes was experiencing family issues and was in the process of applying for disability.  (*Id*., PageID.408-409).

On August 15, 2017, Dr. Wittenberg noted that Grimes "continue[d] to have cervical/thoracic pain."  (ECF No. 10-12, PageID.998).  Grimes reported that she was sore after a recent trip to Virginia Beach with her children.  (*Id*.).  She further reported that she was stable on her pain medications and not experiencing any side effects.  (*Id*.).  On September 12, 2017, Hamama noted that Grimes was experiencing "increased neck and mid back pain with doing more with kids and around house," but "report[ed] Norco remain[ed] helpful."  (*Id*., PageID.995).  On October 9, 2017, Dr. Wittenberg noted that Grimes was experiencing "increased pain," but that her medications and cervical rhizotomies helped.  (*Id*., PageID.991). On November 6, 2017, Hamama noted that while Grimes had "ongoing neck and mid-back pain . . . Norco remain[ed] effective to have pain manageable."  (*Id*., PageID.988).

On November 17, 2017, Dr. Wittenberg performed a cervical rhizotomy at C4-C5 and C5-C6 as well as median branches on the right side.  (*Id*., PageID.985).

9

On December 7, 2017, Dr. Wittenberg noted that Grimes' neck "improved over 50% from last injection, but pain [was] still present." (*Id.*, PageID.979). Grimes reported "muscular pain in upper thoracic and rhomboid region." (*Id.*). Grimes indicated that medication was "no longer providing relief." (*Id.*). On February 1, 2018, Dr. Wittenberg noted that Grimes had increased numbness in both hands as well as "continuing neck and back pain." (*Id.*, PageID.975).

On March 1, 2018, Dr. Wittenberg noted that Grimes had joint pain that was most prominent in her knees and upper extremities. (ECF No. 10-9, PageID.630). Grimes reported that her medications allowed her to function and that she experienced no side effects. (*Id.*). On March 20, 2018, Dr. Wittenberg noted that Grimes was recently diagnosed with inflammatory myopathy and rhabdomyolysis[2] and was awaiting the results of a muscle biopsy. (ECF No. 10-12, PageID.968). Grimes reported that the pain medications were "providing minimal help" and that she was "continuing to have trouble functioning daily." (*Id.*). On April 17, 2018, Hamama noted that Grimes had recently been diagnosed with polymyositis[3] by a

---

[2] "Rhabdomyolysis (often called rhabdo) is a serious medical condition that can be fatal or result in permanent disability. Rhabdo occurs when damaged muscle tissue releases its proteins and electrolytes into the blood. These substances can damage the heart and kidneys and cause permanent disability or even death." https://www.cdc.gov/niosh/topics/rhabdo/default.html#:~:text=Rhabdomyolysis%20(often%20called%20rhabdo)%20is,permanent%20disability%20or%20even%20death (last visited Jan. 28, 2022).

[3] "Polymyositis is a disease that causes muscles to become irritated and inflamed. The muscles eventually start to break down and become weak. The condition can

rheumatologist who started her on prednisone.  (*Id*., PageID.964-965).  Grimes "continue[d] to have generalized muscle pain worse in fingers and knees, difficulty with grasps, worse in left."  (*Id*., PageID.965).  She further reported a recent medication adjustment was "helpful" and denied any side effects.  (*Id*.).  On May 15, 2018, Hamama noted that "prednisone [was] helpful in addition to [N]orco for muscle pain associated with polymyositis."  (*Id*., PageID.960).  Grimes reported neck and midback pain that worsened with rain.  (*Id*.).  She further reported that the medications "help[ed] with daily activity and caring for kids."  (*Id*.).

On May 23, 2018, Dr. Wittenberg performed a cervical rhizotomy at C4-C5 and C5-C6 as well as median branches on the right side.  (*Id*., PageID.958).  On June 12, 2018, Hamama noted that Grimes experience 80% relief from her recent rhizotomy.  (*Id*., PageID.952).  Grimes reported volunteering at her son's school for field day.  (*Id*.).  On July 10, 2018, Hamama noted that "Norco remain[ed] helpful" and that Grimes denied any side effects.  (*Id*., PageID.948).

On August 7, 2018, Hamama noted the Grimes continued to have neck and midback pain as well as muscle tightness.  (*Id*., PageID.944).  Grimes reported that she was mostly stable on her medications and denied any side effects.  (*Id*.).  On

---

affect muscles all over the body.  This can make even simple movements difficult. Polymyositis is one disease in a group of diseases called inflammatory myopathies."  https://www.hopkinsmedicine.org/health/conditions-and-diseases/polymyositis#:~:text=Polymyositis%20is%20a%20disease%20that,make%20even%20simple%20movements%20difficult (last visited Jan. 28, 2022).

September 4, 2018, Hamama noted that Grimes reported increased pain since stopping Methotrexate. (*Id*., PageID.940). She further reported that although the Oxycodone was helpful that it did not provide full pain relief for eight hours. (*Id*.). On October 1, 2018, Hamama noted that Grimes had begun Rituxan infusions, that she experienced ongoing joint pain which was worse with weather, and that she was doing better with the Oxycodone adjustment. (*Id*., PageID.936). On October 30, 2018, Hamama noted that Grimes was experiencing "ongoing joint pain associated with polymyositis." (*Id*., PageID.932). Grimes reported that she was stable on her medications and denied any side effects. (*Id*.). On November 27, 2018, Hamama noted that Grimes "continue[d] to have joint pain associated with polymyositis." (*Id*., PageID.928). Grimes reported that she was able to care for her two children. (*Id*.).

On December 5, 2018, Dr. Wittenberg performed a cervical rhizotomy at C4-C5 and C5-C6 as well as median branches on the right side. (*Id*., PageID.926). On December 20, 2018, Hamama noted that Grimes was experiencing 60% relief from the rhizotomy. (*Id*., PageID.920). Grimes reported that she was stable on her medications and not experiencing any side effects. (*Id*.). On January 16, 2019, Hamama noted that Grimes was experiencing 80% relief from the rhizotomy. (*Id*., PageID.916). Grimes reported that her medications helped her with activities of daily living and caring for her children. (*Id*.). On February 20, 2019, Dr.

12

Wittenberg noted that Grimes was "doing ok" and that she reported the rhizotomy was helpful.  (*Id*., PageID.913).  On March 13, 2019, Hamama noted that Grimes "continue[d] to have neck/thoracic/hand pain."  (*Id*., PageID.909).  Grimes was stretching daily and stable on medications without side effects.  (*Id*.).

2.      Other Records Regarding Physical Impairments

On October 2, 2015, Grimes presented to the emergency department because she was having generalized pain and diarrhea.  (ECF No. 10-11, PageID.896).  An x-ray was done and the impression was "nonspecific abdomen."  (*Id*., PageID.906).

An October 6, 2015 MRI of Grimes' cervical and thoracic spine showed "[m]ild broad disc bulging seen at T2-T3."  (ECF No. 10-10, PageID.683-684).

On November 8, 2015, Grimes presented to the emergency department with vaginal bleeding following her tubal ligation.  (ECF No. 10-11, PageID.866).  Grimes was diagnosed with a urinary tract infection (UTI) and sent home.  (*Id*.).  An x-ray showed:

> 1. Normal bowel gas pattern.
> 2. No radiographic evidence of acute cardiopulmonary disease.

(*Id*., PageID.875).

On March 9, 2016, Grimes presented to the emergency department with chest pain.  (ECF No 10-11, PageID.838).  Grimes' "[w]orkup was significant for a negative CT [ ] chest, and 2 negative troponins."  (*Id*.).  Grimes was advised to follow up with her primary care provider.  (*Id*.).

13

On March 12, 2016, Grimes presented to the emergency department for eye swelling that occurred after she applied eye shadow.  (*Id*., PageID.822).  She was given antihistamine eye drops and reminded not to apply eye shadow.  (*Id*.).

On March 25, 2016, Grimes had a ganglion cyst removed from her left wrist. (ECF No. 10-10, PageID.669).

On May 7, 2016, Grimes had pelvic and transvaginal ultrasounds performed because of her complaints of pelvic pain.  (*Id*., PageID.679).  The ultrasounds showed, "Uterus mildly prominent in size but otherwise ultrasound appeared within normal limits. . ." (*Id*.).

On July 18, 2016, Grimes had a hysterectomy.  (*Id*., PageID.659).  The findings were as follows: "10cm sized uterus.  Right cystic ovary.  Normal appearing tubes bilaterally.  Dense adhesion from anterior uterus to anterior abdominal wall.  Omental adhesions to anterior adnominal wall near umbilicus." (*Id*.).

On July 29, 2016, a CT of Grimes' abdomen and pelvis showed "Nonobstructing LEFT renal calculus.  No mass identified." (*Id*., PageID.677-678).

On October 5, 2016, Vilma Dreclichman, M.D., F.A.C.P., F.I.D.S.A. treated Grimes after she had an outbreak of blisters over her body.  (*Id*., PageID.730).

On December 21, 2016, Brian N. Kirschner, M.D. evaluated Grimes'
complaints of weekly migraines with "aura of strobe lights followed by severe
head pain accompanied by nausea and photophobia." (ECF No. 10-7,
PageID.443). In addition to the weekly migraines, Grimes experienced up to four
pulsing left temple headaches each week which she treated with Norco. (*Id.*). Dr.
Kirschner noted that Grimes had "a normal neurological examination" and
indicated that he would start her on Topiramate. (*Id.*, PageID.444). He
discouraged the use of narcotics to treat headaches and fibromyalgia. (*Id.*,
PageID.444-445).

On December 22, 2016, rheumatologist Steven Portney, M.D. saw Grimes
regarding the blister outbreak. (ECF No. 10-10, PageID.726).

On April 17, 2017, Edward Yousif, M.D. authored a letter indicated that he
had performed a colonoscopy on Grimes and that his impressions were as follows:

> -Two 3 to 4 mm polyps in the sigmoid colon, removed with a cold
> biopsy forceps. Resected and retrieved.
> -The entire examined colon is normal. Biopsied.
> -The examined portion of the ileum was normal.
> -Non-bleeding internal hemorrhoids.

(ECF No. 10-9, PageID.618).

On June 14, 2017, Grimes was examined by Jonathan Fellows, D.O. and
Grimes' chief complaint was migraines. (ECF No. 10-7, PageID.457). Dr.

Fellows increased Grimes' dosage of Topiramate and started her on Tigan. (*Id.*, PageID.460).

On November 8, 2017 Lasmi Manyam, M.D. examined Grimes on behalf of the Social Security Administration (SSA). (ECF No. 10-8, PageID.501-503). Grimes "alleged disability due to fibromyalgia, cervical spondylosis, depression, anxiety, alopecia all over the body and migraine headaches, gastritis and irritable bowel syndrome." (*Id.*, PageID.501). Dr. Manyam's impression was as follows:

1. Neck pain, probably degenerative disc disease.
2. There are a few tender points of the neck, shoulders and between the shoulder blades and she has generalized body aches and IBS, probably mild fibromyalgia.
3. Universal loss of hair.
4. Migraine headaches. She is on medication.
5. IBS.
6. History of depression.

(*Id.*, PageID.503). Dr. Manyam's medical source statement was as follows: "Based on today's exam, the claimant's fine and gross dexterity is intact. The claimant is right handed. No problems using the upper extremities. There may be slight limitations of bending or heavy lifting due to the neck pain. She needs to be evaluated for her depression." (*Id.*).

Imaging of Grimes' cervical spine on the same date indicated the following: "Examination of the cervical spine is negative for fracture, dislocation or bony destruction. Intervertebral disc spaces are maintained. Posterior elements are unremarkable." (*Id.*, PageID.504).

16

On January 9, 2018, Dr. Fellows authored a letter indicating that Grimes had one headache each week, but only one or two migraine headaches each month. (ECF No. 10-9, PageID.629). He recommended no medication adjustment and just " 'watchful waiting.' " (*Id*.). On January 24, 2018, an electromyogram was completed, and it was a "[n]ormal study." (*Id*., PageID.625-628, 644).

Records from Dr. Portney from January 15, 2018, indicate that Grimes began regularly treating with him. (ECF No. 10-10, PageID.721). He requested recent laboratory results and ordered "additional serologic studies to further evaluate autoimmune abnormality." (*Id*., PageID.724).

On February 21, 2018, Dr. Portney's records indicate that he could not "exclude the possibility of an inflammatory myopathy." (*Id*., PageID.719). Grimes reported that she was in constant pain and discomfort and that she was unable to perform all of her activities for her children. (*Id*., PageID.717).

On March 6, 2018, Michael J. Jacobs, M.D., F.A.C.S. authored a letter indicating that Grimes had reported "weakness of her upper extremities more than her lower extremities, but ha[d] difficulty squatting and coming out of a squat." (ECF No. 10-9, PageID.553). Dr. Jacobs referred her for a left thigh muscle biopsy. (*Id*.). On March 15, 2018, Grimes had a muscle biopsy done of her left

thigh.  (*Id.*, PageID.549).  The resulting diagnosis was "[i]nflammatory myopathy, with features consistent with dermatomyositis."[4]  (*Id.*).

On April 2, 2018, x-rays of Grimes' hands were completed, and the impression was as follows: "Unremarkable exam without evidence of bony erosion as clinically questioned." (*Id.*, PageID.558).  On April 19, 2018, a CT scan of Grimes' chest, showed "[i]nterstitial changes within both lungs with no evidence of mass, consolidation or pleural effusion seen." (*Id.*, PageID.614).  Further, "[n]o lymphadenopathy [was] identified." (*Id.*).  On the same date, a CT scan of the abdomen and pelvis showed:

1. Punctate sclerotic focus within the L2 vertebral body.
2. Question tiny cyst with an otherwise normal-appearing left ovary.
3. History of prior hysterectomy.  As such, there may be a prominent vaginal cuff present.

(*Id.*, PageID.615).

Also on that date, records from Dr. Portney reflected Grimes' diagnosis of inflammatory myopathy.  (ECF No. 10-10, PageID.711).  He started her on prednisone.  (*Id.*, PageID.714).  Dr. Portney explained that "[g]enerally, patients

---

[4] "Dermatomyositis is a rare disease that causes muscle inflammation and skin rash.  It's one of a group of muscle diseases that cause muscle inflammation and swelling.  It's different from other muscle diseases because it also causes skin problems.  Dermatoyositis is the term used to describe both muscle and skin symptoms."  https://www.hopkinsmedicine.org/health/conditions-and-diseases/dermatomyositis#:~:text=Dermatomyositis%20is%20a%20rare%20disease,both%20muscle%20and%20skin%20symptoms (last visited Jan. 28, 2022).

who are diagnosed with an inflammatory myopathy may have this secondary to an underlying malignancy." (*Id*.). As such, he suggested that she follow up with her primary care physician regarding her new diagnosis. (*Id*.). June 12, 2018 records from Dr. Portney reflect that he considered decreasing prednisone as Grimes' labs were stable. (*Id*., PageID.709). He also requested additional laboratory studies to check Grimes' CPK value, metabolic abnormalities, and glucose. (*Id*.).

Dr. Fellows' October 17, 2018 notes indicate that Grimes "headaches [were] under good control." (ECF No. 10-9, PageID.639). Grimes took Topamax daily and took Imitrex for abortive therapy and Tigan for antinausea care. (*Id*.). Grimes indicated that she had been diagnosed with dermatomyositis for which she was prescribed prednisone. (*Id*.).

On August 3, 2018, Dr. Portney noted that if Grimes' CPK increased on a persistent basis that he may need to adjust her medications. (ECF No. 10-10, PageID.705-706).

On August 28, 2018, Grimes presented to the emergency department complaining of "dull, intermitted right lower quadrant abdominal pain that varies in intensity from 4-10." (ECF No. 10-11, PageID.784). Grimes was given morphine and Zofran and advised to follow up with Dr. Portney. (*Id*., PageID.785). An August 29, 2018, CT of Grimes' abdomen and pelvis showed "[n]o CT findings to explain [her] abdominal pain." (*Id*., PageID.802).

Dr. Portney's October 22, 2018 records indicated that Grimes "had infusions of Solu-Medrol as well as two Rituxan treatments." (ECF No. 10-10, PageID.701). He indicated that he would "[m]onitor CPK and other laboratory studies following Rituxan infusions." (*Id*.). Dr. Portney's December 3, 2018 records were much the same; he indicated that if there was no improvement to Grimes' CPK then he would "need to determine if other therapies would be more beneficial." (*Id*., PageID.696). January 14, 2019 records from Dr. Portney indicate that he would "[m]onitor CPK and other laboratory studies following Rituxan infusion." (*Id*.). He also suggested that Grimes restart prednisone at a decreased dose. (*Id*.).

Records from Schoenherr Internal Medicine indicate that on April 22, 2019, Grime was seen to establish a primary care physician and for a health maintenance examination. (ECF No. 10-13, PageID.1053). Grimes reported her dermatomyositis diagnosis for which she was hospitalized from March 24 to March 28, 2019. (*Id*., PageID.1053, 1062-1078). Grimes attributed her neck and hand pain to her dermatomyositis. (*Id*., PageID.1053).

### 3.    Records Regarding Mental Impairments

An undated letter from Paul Lessem, M.D. indicates that he treated Grimes intermittently between October 14, 2014, and August 23, 2017. (ECF No. 10-8, PageID.489-490). On August 23, 2017, Grimes appeared "coherent but somewhat concrete with good instincts regarding her need to care for her children but has

20

very limited insight and judgement, she feels totally unable to work a job." (*Id.*, PageID.489). Dr. Lessem stated that he "would diagnose her as having major depression and a severely damaged personality structure such as one sees in adults who were chronically abused in childhood." (*Id.*, PageID.490). Her psychotropic medications included Celexa, Bupropion, and Clonazepam. (*Id.*).

On November 8, 2017, Grimes underwent a psychological assessment for the SSA. (*Id.*, PageID.495-499). The examiners' diagnostic impression was that Grimes suffered from generalized anxiety disorder, major depressive disorder (recurrent and severe without psychotic features), panic disorder, and adjustment disorder (recurrent with mixed anxiety and depressed mood). (*Id.*, PageID.499). The medical source statement was as follows:

> [Grimes] does appear able to maintain her benefit funds based on this assessment. She does appear to have problems with anxiousness and depressive episodes. [Grimes] would appear to have difficulty maintaining standards of behavior and safety issues due to her current issues associated with medical problems and psychiatric issues. Continued interaction with her mental health team is recommended. Perhaps psychological testing should be completed to determine her cognitive functioning.

(*Id.*).

On April 22, 2019, Grimes underwent an intake assessment at Ascension Eastwood Behavioral Health. (ECF No. 10-13, PageID.1080). Grimes presented with major depressive disorder and generalized anxiety disorder. (*Id.*). In regard to her mental status, Grimes' appearance was well-kept, behavior was sad, rapport

was established, mood/affect was full-range, perceptions showed no distortion, thought process was logical, motivation was internal, memory short- and long-term were intact, intelligence was average, judgment was fair, insight was poor, impulse was fair, and she was oriented to time, place, person, and situation.  (*Id*.).

III.     Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively

presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Grimes was not disabled under the Act. At Step One, the ALJ found that Grimes had not engaged in substantial gainful activity since July 31, 2015 (alleged onset date). (ECF No. 10-2, PageID.53). At Step Two, the ALJ found that she had the severe impairments of obesity (BMI 35) status-post gastric bypass in 2013 (lost 80 pounds), myopathy, fibromyalgia, mild cervical spondylosis, mild interstitial changes in the lungs, generalized anxiety disorder, major depressive disorder, a

23

panic disorder, an adjustment disorder, and migraines.  (*Id.*).  At Step Three, the

ALJ found that Grimes' impairments, whether considered alone or in combination,

did not meet or medically equal a listed impairment.  (*Id.*, PageID.54-56).

The ALJ then assessed Grimes' RFC, concluding that she was capable of

performing

> light work as defined in 20 CFR 404.1567(b) except no more than
> frequent lifting and carrying; occasional pushing and pulling; frequent
> balancing; occasional stooping, crouching, kneeling, and climbing
> stairs and ramps; frequent fine and gross manipulation, reaching (no
> overhead reaching), and rotation, flexion, and extension of the neck; no
> foot control operation, crawling, and climbing ladders, ropes, and
> scaffolds; avoid more than occasional exposure to environment irritants
> and all exposure to hazardous machinery, unprotected heights, and
> extreme heat/cold; limited to simple, routine tasks that requires no
> production rate pace; simple, work-related decisions; occasional
> interaction with coworkers and supervisors; and no interaction with the
> public.

(*Id.*, PageID.56).

At Step Four, the ALJ found that Grimes was unable to perform any past

relevant work.  (*Id.*, PageID.60).  At Step Five, the ALJ determined, based in part

on testimony provided by the VE in response to hypothetical questions, that

Grimes was capable of performing the jobs of assembly (100,000 jobs nationally),

packaging (100,000 jobs nationally), and visual inspection (50,000 jobs

nationally).  (*Id.*, PageID.61).  As a result, the ALJ concluded that Grimes was not

disabled under the Act.  (*Id.*).

IV.    Standard of Review

24

The District Court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g). Although the court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one. Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision. *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence." 42 U.S.C. § 405(g). The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The Court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotations omitted).

V.   Analysis

Grimes presents two primary arguments on appeal: (1) the ALJ's Step Two

analysis is not supported by substantial evidence, and (2) the ALJ's Step Three

analysis does not address listing 14.05 and is not supported by substantial

evidence.

A.   Step Two

Grimes argues that the ALJ erred when she failed to classify her

polymyositis and dermatomyositis as severe impairments.

At Step Two, an "impairment or combination of impairments . . . [is] found

'not severe' . . . when medical evidence establishes only a slight abnormality or [ ]

combination of slight abnormalities which would have no more than a minimal

effect on an individual's ability to work."  SSR 85-28, 1985 WL 56856, *3 (1985).

"In the Sixth Circuit, the severity determination is 'a *de minimis* hurdle in the

disability determination process.' "  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th

Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).  "The goal

of the test is to 'screen out totally groundless claims.' "  *Id*.  (quoting *Farris v.*

*Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  20 C.F.R. §§

404.1522(a) and 416.922(a) define a non-severe impairment as one that does not

"significantly limit [the] physical or mental ability to do basic work activities."

*See also* SSR 85-28, supra, at *3 ("Basic work activities" refers to "walking,

27

standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing,

hearing, and speaking;" and the capacity for "[u]nderstanding, carrying out, and

remembering simple instructions;" "[u]se of judgment;" "[r]esponding

appropriately to supervision, co-workers and usual work situations;" and,

"[d]ealing with changes in a routine work setting"). *Id*. "[T]he term 'significantly'

is liberally construed in favor of the claimant." *Wilder v. Berryhill*, No.

1:17CV2609, 2019 WL 1428215, at *4 (N.D. Ohio Mar. 29, 2019).

As a preliminary matter, the undersigned notes that different providers

referred to Grimes' diagnosis of a muscle disease in different ways. For instance,

the results of Grimes' muscle biopsy indicate that her diagnosis was

"[i]nflammatory myopathy, with features consistent with dermatomyositis." (ECF

No. 10-9, PageID.553). However, providers at Neuro Pain Consultants in

Bloomfield Hills often referred to Grimes' diagnosis as polymyositis. The diseases

are both types of idiopathic inflammatory myopathies but are distinct subtypes.[5]

> The main clinical features of [polymyositis] and [dermatomyositis]
> include progressive symmetric, predominantly proximal muscle
> weakness. Laboratory findings include elevated creatine kinase (CK),
> autoantibodies in serum, and inflammatory infiltrates in muscle biopsy.
> Dermatomyositis can also involve a characteristic skin rash. Both
> polymyositis and dermatomyositis can present with extramuscular
> involvement.[6]

---

[5] https://www.sciencedirect.com/science/article/pii/S2589909019300188 (last
visited Jan. 30, 2022).
[6] *Id*.

All that said, Grimes appears to fault the ALJ for a mistake she did not make.  The ALJ found Grimes to have the severe impairment of "myopathy." (ECF No. 10-2, PageID.53).  As previously stated, both polymyositis and dermatomyositis are types of idiopathic inflammatory myopathies.  Grimes herself testified to this fact at the hearing when she explained that she had been "diagnosed with a pretty rare muscle disease," which was "a type of inflammatory myopathy."  (ECF No. 10-3, PageID.83).  Accordingly, the ALJ found Grimes' muscle disease to be a severe impairment.  The difference in terminology used by the ALJ and Grimes appears to have led to some confusion, but there was no error.

Moreover, even if the ALJ failed to consider the impairments of polymyositis and dermatomyositis as severe, Grimes is nonetheless not entitled to a remand.  First, "[t]he fact that some of [a claimant's] impairments were not deemed to be severe at step two is . . . legally irrelevant" where other impairments are found to be severe.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). "An erroneous finding of nonseverity at step two is therefore harmless where the ALJ properly considers nonsevere impairments at later steps."  *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020); *see also Gray v. Comm'r of Soc. Sec. Admin.*, 365 F. App'x 60, 61 (9th Cir. 2010) (holding that a finding of nonseverity at step two was legally irrelevant where the ALJ complied with SSR 96-8p's requirements, even where the ALJ did not specifically reference nonsevere

29

impairments in the residual-functional-capacity analysis). Here, the ALJ found a number of severe impairments. Accordingly, the ALJ's failure to classify polymyositis and dermatomyositis as severe impairments does not necessitate remand as long as the ALJ complied with SSR 96-8p's requirements.

Twenty C.F.R. § 416.945(e) provides that the ALJ will consider the "limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity." SSR 96-8p explains that, "[i]n assessing [residual functional capacity], the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' " According to Grimes, the ALJ failed to account for the limitations and restrictions imposed by polymyositis and dermatomyositis. However, this argument ignores the fact that the ALJ considered the limitations "inflammatory myositis would case." (ECF No. 10-2, PageID.57).

In the RFC section, the ALJ wrote:

A later report noted that [Grimes] complained of muscle weakness in March 2018 and a left thigh biopsy revealed inflammatory myositis. However, it was noted that the muscle pain/weakness was much improved within the next three weeks. And subsequent reports contain no relatable complaints or clinical signs. For example, [Grimes] repeatedly had full strength, range of motion, sensation, reflexes, and motor function of the spine and all extremities. She also had negative Romberg signs and intact coordination. The reports also show that the claimant denied weakness, numbness, and tingling at office visits through the end of 2018.

[Grimes] did have renewed complaints of widespread pain in January and March 2019. However, the only positive findings were weakness with grasping with both hands, mild facet loading pain with the right hand, and joint tenderness and limited extension of the knees. Despite those findings, it is pointed out that, like the prior examinations, the claimant had normal strength and coordination throughout the body at the most recent office visit in April 2019. Overall, despite the lack of positive findings at the majority of office visits, the residual functional capacity still accommodates the noted symptoms/signs by limiting lifting to 20 pounds, postural activities, and activities that involve using the hands and lower extremities.

(*Id.* (internal citations omitted)). This thorough explanation demonstrates that the ALJ fully considered the effects of myopathy/myositis on Grimes and incorporated these considerations in the RFC. Moreover, the fact that the ALJ did not rely upon a particular medical opinion when crafting the RFC is not grounds for remand because the ALJ's RFC finding need not correspond to a particular physician's opinion, *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the argument that the ALJ is required to base her determination on a physician's opinion), and "[n]o bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding, but the administrative law judge must make a connection between the evidence relied on and the conclusion reached," *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019). Therefore, the ALJ did not commit error at Step Two or when crafting the RFC.

B.     Step Three

31

Grimes next argues that the ALJ erred when she failed to consider Listing 14.05 (polymyositis and dermatomyositis).

At Step Three, the ALJ considers a claimant's impairments and determines whether an impairment meets or equals a listed impairment or whether the combination of impairments equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). A listed impairment is considered "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). If a claimant meets or equals the criteria of a listed impairment, she will be found disabled at Step Three. 20 C.F.R. § 404.1520(a)(4)(iii).

Here, the ALJ found the severe impairments of obesity (BMI 35) status-post gastric bypass in 2013 (lost 80 pounds), myopathy, fibromyalgia, mild cervical spondylosis, mild interstitial changes in the lungs, generalized anxiety disorder, major depressive disorder, a panic disorder, an adjustment disorder, and migraines. However, "neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.' " *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (citations omitted). Rather, the ALJ must discuss a relevant listing when the record raises a "substantial question," but to do so, a claimant "must point to specific evidence that demonstrates [she] reasonably could meet or equal every requirement

32

of the listing." *Id*. (citations omitted).  Accordingly, the Court therefore must

determine whether the record evidence raises a substantial question as to Grimes'

ability to satisfy each requirement of Listing 14.05.

First, however, as the Commissioner notes, Grimes failed to raise the listing

argument before the ALJ.  Rather than a Step Three argument, Grimes made a Step

Five argument at her hearing.  *See* ECF No. 10-2, PageID.54.  The Sixth Circuit

has held that a failure to raise a listing argument before the ALJ means the ALJ is

not obligated to specifically address that listing in her decision.  *Wilson v. Comm'r*

*of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015) ("But Wilson's counsel did not

mention those particular listings at Wilson's hearing before the ALJ, and Wilson

offers no evidence that those listings applied to her.  The ALJ was therefore not

obligated to discuss those specific listings."); *see also Malone v. Comm'r of Soc.*

*Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) (rejecting the claimant's assertion that

the ALJ had to specifically discuss a particular listing where the claimant did not

argue that he had a listed impairment at his administrative hearing; *Walker v.*

*Barnhart*, 72 F. App'x 355, 357 (6th Cir. 2003) (holding that a claimant who did

not assert a disability claim under a specific regulatory listing was "not entitled to

an award of benefits under that listing").  Therefore, Grimes' listing argument

should be rejected because she failed to raise it before the ALJ.  However, for the

sake of completeness, the undersigned will consider below whether Grimes raises a substantial question that her impairment met or equaled the listing.

Listing 14.05E requires "repeated manifestations" of polymyositis or dermatomyositis in addition to at least two of the following: severe fatigue, fever, malaise, or involuntarily weight loss over a continuous 12-month period as well as one of the following at the marked level: (1) limitation of activities of daily living, (2) limitation in maintaining social functioning, or (3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.05E; *accord* Social Security Acquiescence Ruling (AR) 15- 1(4), 2015 WL 5564523, 80 Fed. Reg. 57418, at *57420 (Sept. 23, 2015) (requiring listing-level medical criteria to be present for a continuous 12-month period).

The Commissioner concedes that Grimes experienced repeated manifestations of polymyositis or dermatomyositis.  (ECF No. 17, PageID.1141 n.4).  Thus, the undersigned considers whether Grimes has established she experienced severe fatigue, fever, malaise, or involuntarily weight loss as a starting point.

Grimes specifically argues that she experiences severe fatigue and malaise evidenced by chronic depression.  However, even assuming the record establishes that Grimes suffers from both severe fatigue and malaise this is still not enough to

satisfy Listing 14.05E.  She must also demonstrate that she experiences one of the following at the marked level: (1) limitation of activities of daily living, (2) limitation in maintaining social functioning, or (3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.05E; *see Campbell v. Comm'r of Soc. Sec.*, No. 1:13cv906, 2014 WL 7409842, at *7 (S.D. Ohio Dec. 31, 2014).

"The 'marked' impairments required to show that Plaintiff meets or equals Listing 14.05E parallel the findings required to show that Plaintiff meets or equals mental health Listings 12.04 (affective disorders), 12.06 (anxiety related disorders), and/or 12.09 (substance addiction disorders)."  *Campbell*, at *7.  While the ALJ did not consider Listing 14.05E, she did consider both Listing 12.04 (depressive, bipolar, and related disorders) and Listing 12.06 (anxiety and obsessive-compulsive disorders).  Accordingly, the ALJ did consider whether Grimes experiences (1) limitation of activities of daily living, (2) limitation in maintaining social functioning, or (3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

As to the first criteria – limitation of activities of daily living – the ALJ found that Grimes "stated that she enjoyed watching television, listening to music, reading the Bible, using a tablet, and attending religious services."  (ECF No. 10-2, PageID.55).  She further noted that Grimes "told the consultive examination [sic]

35

that she was responsible for everything in her home, including taking care of her young children." (*Id*).  In addition, Grimes drove herself to the consultive examination, arrived on time, and demonstrated appropriate hygiene and grooming.  (*Id*.).  Overall, the ALJ's summation of the evidence demonstrates that Grimes did not experience a marked limitation of activities of daily living.

In regard to the next criteria – limitation in maintaining social functioning – the ALJ found that Grimes had a moderate limitation in interacting with others. (*Id*.).  The ALJ explained that

> [a]lthough [Grimes] claimed to be socially withdrawn, she was cooperative at office visits and reported that she attends religious services every Wednesday and Sunday.  Furthermore, [Grimes] has good relationships with family members and she had full mood and affect and denied panic attacks and irritable/aggressive behavior as recently as April 2019.  Lastly, her mother completed a third-party functional questionnaire and did not indicate any difficulty in this area. In fact, her mother wrote that [Grimes] gets along well with others.

(*Id*. (internal citations omitted)).  The ALJ's determination that Grimes experienced only a moderate limitation in interacting with others was thus supported by substantial evidence.

The final criteria – limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace – was also considered by the ALJ.  The ALJ found that Grimes had a moderate limitation in this area.  (*Id*.). The ALJ explained that,

> [d]espite [Grimes'] allegations, there is nothing in the treatment records
> to indicate any problems in this area.  For example, at the consultive
> examination in November 2017, [Grimes] was spontaneous, organized,
> relevant, and logical.  She also had no difficulty giving information
> when requested.  And she demonstrated adequate concentration—she
> repeated four numbers forward and backward, recalled all three objects
> after a three-minute delay, correctly performed math calculations, and
> named presidents and large cities.

(*Id.* (internal citation omitted)).  The ALJ's conclusion that Grimes experiences

only a moderate limitation in this area is also supported by substantial evidence.

Ultimately, the record establishes that Grimes has some mental limitations,

however, substantial evidence nonetheless supports the ALJ's determination that

she did not experience marked limitations in any particular area.  Therefore,

Grimes has failed to raise a substantial question regarding whether she satisfies

Listing 14.05E.

## C.    In Sum

Clearly Grimes suffers from some medical conditions.  However, substantial

evidence supports the ALJ's finding that her impairments do not preclude her

ability to work within the confines of the RFC.  Because the ALJ's determination

was within the "zone of choice" accorded to the fact-finder at the administrative

hearing level, they should not be disturbed by this Court.  *Blakley, supra,* 581 F.3d

at 406.

## VI.    Conclusion

For the reasons set forth above, it is RECOMMENDED that the

Commissioner's motion be GRANTED, Grimes' motion be DENIED, and that

under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be

AFFIRMED.

Dated: February 9, 2022                    s/Kimberly G. Altman
Detroit, Michigan                          KIMBERLY G. ALTMAN
                                           United States Magistrate Judge

## <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of
record and any unrepresented parties via the Court's ECF System to their
respective email or First Class U.S. mail addresses disclosed on the Notice of
Electronic Filing on February 9, 2022.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager
